# T. W. Spinks Co., Inc., et al. v. Pachoud Bros.
### (Decided March 10, 1936).

GREGORY W. HUGHES and M. H. McLEAN, JOHN L. VEST and BEN RILEY for appellants.

CHARLES F. FURBER, SR., N. E. RIDDLE and BENTON, BENTON, SMITH & LUEDEKE for appellees.

OPINION OF THE COURT BY JUDGE RICHARDSON— Affirming.

J. W. Glasscock, prior to and on the 9th day of December, 1929, was the owner of a tract of land situated in Boone county, Ky. He decided to, and did, divide about 43 acres of it into lots, and sell the same to carpenters. Accordingly he entered into separate contracts with Otto Browning, Lawrence J. Thompson, E. S. Mattingly, and others, agreeing to sell and convey to each of them certain lots at an agreed price due 150 days after date, and to execute and deliver a deed when the consideration was "paid in full." He obligated himself to pay the taxes assessed against the lots before he executed a deed, which were to be added to the purchase price. The contract obligated each of the purchasers "to start building a foundation for a house on the lots within one (1) week from the date and to complete foundation within three (3) weeks

from date and to complete building house within one hundred and fifty (150) days from date." It contained this stipulation:

"Said second party agrees to do all the work on said house; in other words, he agrees that there will be no labor claims against said house and that material bills are to be paid out of the loan, or otherwise, before he receives any money for his work."

It sets forth numerous building restrictions.

By a separate writing he obligated himself to advance to the purchaser, after the foundation had been laid to a certain height, $25; after the rafters and framing were erected, $25; after the sheeting was put on and chimneys built, $25; after the erection of the gutters and the placing of the shingle roof, $25; when the floors were laid and the house "closed in," $25; and when the residence was fully completed, $25.

He had used the form of contract of sale and plan of building by purchasers of other lots, before these contracts were made, and when carrying out the previous contracts, the purchasers had secured building material from individuals, firms, and corporations of small capital. At the date of the contracts now involved, Pachoud Bros. of Cincinnati, Ohio, were engaged on a large scale in the business of furnishing building material and supplies for constructing residences. His plan of building the residences on the subdivided 45 acres, as he had devised it, required the use of much material by the purchasers. For this reason he desired they deal therefor with Pachoud Bros. or some other large dealer in building material and supplies. Hence, after he had signed the contract with Browning, Thompson, Mattingly, and others, on the 20th day of November, 1929, he wrote, signed, and mailed a letter to Pachoud Bros., inviting "an official" of the company "to drop in to see him," and informed them that he had in mind a matter that might work out to his and their mutual interest, and "develop into a volume of business." In compliance with this letter, Nelson, S. Marsh, a salesman of Pachoud Bros., called immediately at Glasscock's office, who informed him "that he was about to start some buildings out in the Erlanger Heights Sub-Division, * * * that he had de-

vised a sale contract by which he was selling these lots to certain people for the purpose of building a house and explained * * * that these people were buying under these sale contracts * * * and that they required lumber and material to build the houses and asked" him (Marsh) "if his company would be interested." Marsh stated to him that he was not an official of the company, but that he "was down there to get all the information about his proposition that was available"; again Glasscock explained to him that he would send them" to Marsh's company, "and notify his company by phone or note who the parties were so that the company would know they were from him." Marsh stated to him he was of the opinion, if payments were not made within a certain time, Pachoud Bros. would require surety; Glasscock stated he "did not have any objection to" the company filing liens, and "advised him to do so." Marsh further inquired of him if there were any encumbrances on the property, when Glasscock responded: "No, there is a clause in this contract where the builders waive their rights to a lien," and he "owned the property and it was free and unencumbered." Glasscock assured him that he was "connected with the buildin gand loan associations, and "that they could be financed." Marsh returned to the office of Pachoud Bros. and reported to those in charge of the company fully his conversation with Glasscock.

Marsh was only a salesman and did not have authority to accept Glasscock's proposition; therefore, within a short time thereafter, Lawrence E. Pachoud, and Nelson S. Marsh went to Glasscock's office, where they received the proposition from Glasscock which Marsh had reported to the office. To Lawrence E. Pachoud, a member of the firm, and Marsh, at the office of Glasscock, he again stated his proposition to induce them to accept or reject it. He agreed with Pachoud and Marsh that Pachoud Company could sell the material to the lot purchasers; and stated that his "plan was to get the building and get the material man to supply the material until such time as the houses were completed and ready for a loan." He explained that the purchasers or builders were practical men who knew the building industry and that they would build these houses entirely with their own labor, and, under

the agreement which he was going to make with them, "they would sign away their lien rights on the property," and, when the buildings were completed, the building and loan association would cover the materials and lots. He stated "there were no prior obligagations on these properties." Pachoud asked him "if there were any obligations that would occur ahead" of his company's lien, and he said "there were none."

On the written consent as evidenced by Glasscock's contracts with the purchasers of the lots and that orally given by him to Marsh and Pachoud between November 20, 1929, and March 4, 1930, Pachoud Bros. furnished material and supplies to Glasscock's lot purchasers, and on the latter date Pachoud Bros., by letter addressed and mailed to him, informed him they had furnished and delivered to Glen G. Beighle $1,074.89; Leslie C. Cason, $1,246.41; A. T. Scott and H. Grote, $1,142.81; James A. Hall, $813; R. R. Campbell, $930; Edw. V. White, $1,364.33; Charles Houze, $1,115.34; and intended to file materialmen's liens in the county clerk's office and requested a letter of Glasscock's consenting to filing them. To this letter Glasscock responded:

"I can have no objection to your filing said liens. As per our conversation in the beginning, this property has been sold by me to various people to whom you have furnished the material and with whom you entered into contracts, and I have a vendor's lien for the unpaid purchase price of the lots which would be a superior lien to your claim. Any liens which go on this property will, of course, go on subject to the unpaid purchase price of the lot."

At the time Pachoud Bros. received this letter they had made estimates and prices to a number of other purchasers of lots, of material and supplies for the erection of residences on lots purchased of Glassock. On receiving Glasscock's letter, the company decided to comply with the contracts to furnish material and supplies to the purchasers of lots with whom it had agreed up to that date and not thereafter to furnish any other purchasers of the lots any other material or supplies. Glasscock, obtaining information that Pachoud Bros. had refused to furnish other purchasers material and

supplies, between the 15th and 23rd of April, 1930, went to the office of Pachoud Bros. to discuss with them the furnishing material to other purchasers of lots. Pachoud informed him the company did not intend to furnish any more material to the purchasers of his lots. Glasscock thereupon stated ''that he had entered into a contract with several more lot-purchasers, about eight, and had promised them delivery of building material on credit,'' through Pachoud Bros., and, ''if they did not furnish these materials, that he would be liable for non-performance of his promise,'' and that, ''if Pachoud Brothers would furnish the ones that he still had under contract, it would release him from this obligation.'' In compliance with this arrangement, Pachoud Bros. furnished material and supplies for the erection of eight more residences on lots purchased of Glasscock. Thereafter it ceased to furnish material or supplies to other purchasers. This agreement was, and is, sufficient to constitute a ratification of all that had gone before, and also Glasscock's consent for Pachoud Bros. to furnish material for the construction of eight residences, with the right to assert mechanic's liens on the lots and residences constructed with material furnished by Pachoud Brothers.

Accordingly, within six months after Pachoud Bros. furnished the material to the several lot purchasers, they filed in the office of the county court clerk of the county in which the buildings were situated separate statements of the amounts due, with all just credits, together with a description of the property intended to be covered by the liens, sufficienty accurate to identify it, and the names of the purchasers of the lots and that the material and supplies were furnished by a contract with each of the lot purchasers. See section 2468, Kentucky Statutes.

It is fair to Glasscock to state that he and his employees deny the conversation detailed in the testimony of Pachoud and Marsh, and further testified that Glasscock expressly stated to Marsh on his first visit at the office of Glasscock, and to Pachoud and Marsh on their visit thereat, and at other places, that Glasscock had a purchase-money lien against each lot sold by him to the purchaser, and that, whatever material was sold and delivered by Pachoud Bros. to lot purchasers, any lien the company might secure under the mechanic's lien law

against the lots as improved with the material would be inferior to his. In his testimony Glasscock states positively that he informed all persons, firms, and corporations from whom the purchasers of the lots obtained material and supplies with which to construct residences that he had purchase-money liens on the lots which must first be satisfied before that of any materailman. It is noted that the record contains Glasscock's letter dated January 17, 1933, addressed to Reinhart Concrete Block Company, wherein he declared to it:

"'This is to advise you that there is no encumbrance of any nature, no street assessments, loans, taxes or otherwise against my Erlanger Heights Sub-Division, which comprises approximately 600 lots.'"

The statement in this letter is substantially that which Marsh and Pachoud testified he made to them. Glasscock's letter to Pachoud Bros. requesting an official of the company to visit his office with the assurance that he had a matter in mind which might work out to their mutual interests and which no doubt would develop into a considerable volume of business, is entirely inconsistent with the evidence in his behalf, to the effect that, after so inviting an official of Pachoud Bros. for the purpose of inducing the sale and delivery of material to build residences on lots sold under his contract with purchasers thereof, he then and there informed him that he had purchase-money liens on the lots, and whatever material the company furnished would be subject to his liens.

The assertion that Pachoud Bros. was so informed by Glasscock, and that they, notwithstanding, proceeded to sell insolvent men building material with which to erect residences on lots covered by purchase-money liens, is out of harmony with the rational actions of ordinarily prudent dealers in builder's material and supplies.

The trial court properly accepted the verity of the evidence in behalf of Pachoud Bros., and, in our opinion, correctly decreed the company's liens were superior to the purchase-money liens of Glasscock.

It is true that section 2463, Kentucky Statutes, authorizes the assertion of a mechanic's lien for materials

furnished in the erection of a residence "by contract with, or by the written consent of, the owner"; and that such lien, if asserted as provided in other sections of the statutes, shall date back and take effect from the time of the furnishing the materials; "provided, that no person who has not contracted directly with the owner * * * shall acquire a lien under this section unless he shall notify in writing the owner of the property to be held liable, * * * within thirty-five days after the last item of said material or labor is furnished, of his intention to hold said property liable, and the amount for which he will claim a lien."

It is also true that section 2468 requires a statement thereunder to contain the name of the owner of the propery intended to be covered by the lien.

It will be observed that section 2463 and 2468 employ the word "owner," and section 2464 contains this language: "If the owner claims by executory contract," etc. When the word "owner," as it is used in sections 2463 and 2468, is considered in connection with the quoted phrase of section 2464, it is plain that our mechanic's lien statutes confer upon claimants for labor or material furnished under a contract with the owner, with which to erect a building on land, the right to assert a lien thereunder against him, whether he is an owner in fee simple or under an executory contract.

There is no provision, clause, or phrase to be found in our mechanic's lien statutes requiring either the 35 days' notice provided for in section 2463 to be given to a purchase-money lienholder or his name to be given in the statement required by section 2468.

Section 2463 only requires the 35 days' notice to be given to the owner under the circumstances therein stated. And section 2468 requires the statement therein provided for to name only the owner of the land on which the labor or materialmen's lien is asserted thereunder.

Generally, the word "owner" when used alone imports an absolute owner or one who has complete dominion over the property owned, as the owner in fee of real property. "There may be a legal and an equitable estate; the trustee and the cestui que trust are both owners. He is the owner of property who, in case of its

destruction, must sustain the loss of it." 22 R. C. L. 75. "As applied to real property, the word may designate the owner of the fee or the owner of a less estate, * * * and its meaning is to be gathered from the connection in which it is used and from the subject-matter to which it is applied." 16 R. C. L. 532.

The word "owner" in sections 2463 and 2468 must be construed in the light of the language of section 2464, as embracing or meaning an owner in fee simple or by an executory contract. To construe the word "owner" otherwise is to be forgetful of the above phrase in section 2464.

It is true that in some jurisdictions the courts rule that a vendee under an executory contract is not the owner of the land within the meaning of the mechanic's lien statutes allowing liens to those furnishing labor or material in the construction of a building under or by virtue of a contract with the owner, and cannot bind the interest of the vendor by contracting with the former to have improvements made upon the land. See Huff v. Jolly, 41 Kan. 537, 21 P. 646; Conner v. Lewis, 16 Me. 268; Gray v. Carleton, 35 Me. 481; Courtemanche v. Blackstone Valley Street Ry. Co., 170 Mass. 50, 48 N.E. 937, 64 Am. St. Rep. 275; Faber v. Muir, 27 Tex. Civ. App. 27, 64 S. W. 938, Hubbell v. Texas Southern R. Co., 59 Tex. Civ. App. 185, 126 S. W. 313; Wilkerson & Statterfield v. McMurry (Tex. Civ. App.) 167 S. W. 275.

In those states it is ruled that in such case "the material man is simply subrogated to the interest that the vendee had in the contract, and no more. The vendor's rights are not at all to be affected."

Another line of cases is where the vendor by executory contract retains title to the realty until the purchase price is paid; as to the materialman's lien, he is the owner. Fine v. Dyke Bros., 175 Ark. 672, 300 S. W. 375, 58 A. L. R. 907.

Ordinarily, a mechanic's lien for supplies and material is not superior to the lien of the vendor of realty. Northern Bank of Kentucky v. Deckebach, 83 Ky. 164; Orr v. Batterton, 14 B. Mon. 100; Cooley v. Black, 105 Ky. 267, 48 S. W. 1075, 20 Ky. Law Rep. 1181; Goodwin & Barney Coal Co. v. Southern Elkhorn Coal Co., 219 Ky. 827, 294 S. W. 792; Penney v. Kentucky Utilities Co. et al., 238 Ky. 167, 37 S. W. (2d) 5.

However, the courts agree without an exception that, if the contract of sale of realty expressly or impliedly provides that the vendee should erect a building or an improvement on the premises, and the building or improvement is made under such a contract, it is deemed to be with the owner's consent, within the meaning of a statute providing for a lien for improvements made with the owner's consent. See annotation, 58 A. L. R. 922 to 938, inclusive. We applied this principle in Penney v. Kentucky Utilities Co. et al., supra. Our application of it was predicated on the language of section 2463. The Penney Case, on the facts, is distinguishable from Weir et al. v. Jarecki Mfg. Co. et al., 254 Ky. 738, 72 S. W. (2d) 450.

Glasscock, at the time Pachoud Bros. furnished the material, was not, and is not now, the owner of the lots. He was then, and now, merely asserting liens on the interest of the purchasers in the lots as security for the payment of the agreed consideration. This action involves not a contest between the owner of the lots and the owner of materialmen's statutory liens. It is merely one between two lienholders to subject to the satisfaction of his respective lien the interest of the owners of lots under executory contracts.

At the time Pachoud Bros. contracted with the lot purchasers to furnish the material and supplies, the latter were the owners of the lots under an executory contract, and in the actual possession of them, subject to the liability for the unpaid purchase price; Glasscock holding the legal title in trust for the purchasers as a security for the payment of the agreed consideration. Benjamin v. Dinwiddie, 226 Ky. 106, 10 S. W. (2d) 620.

"Although there are decisions to the contrary, the weight of authority is to the effect that a purchaser in possession of real property under a contract of sale is so far an owner that he can by his contract for improvements on the land render his interest therein subject to a mechanic's lien." 40 C. J. sec. 110, p. 111.

The decisive issue in the present case is, Are Pachoud Bros.' liens superior to Glasscock's purchase-money liens on the interest in the improved lots of the owners under the executory contracts? Its determination in no way involves Glasscock's rights as owner of

the lots. It is easy to be seen that the developed facts bring the solution of this issue within the exception to the general rule that a mechanic's lien for material and supplies is subject to the purchase-money lien of the vendor.

The facts here are much stronger than those in the Penney Case. In it there was only a written consent. Here there were both written and oral consent, a subsequent ratification, and further assurance and representation that the lots on which Pachoud Bros. now seek to assert mechanics' liens were free and unencumbered and that Pachoud Bros.' liens would be the first or superior. On the facts, it would not only be a violation of, but a reproach to, the principles of equity to allow Glasscock to repudiate his arrangement with Pachoud Bros. and the lot purchasers, and give preference to his purchase-money liens, and thus impose upon Pachoud Bros. the resulting loss.

The liens asserted by T. W. Spinks Company are governed by entirely different facts. It and Pachoud Bros. stipulated that each had liens on certain improved lots, and they should be regarded by the court of equal dignity, unless it should be determined that a certain letter of Glassock to T. W. Spinks Company should change their rights to the liens.

T. W. Spinks Company and Glasscock stipulated that T. W. Spinks Company had furnished the material stated in its pleadings and had liens on the lots described in its pleadings, but that, before it furnished the material, it had knowledge of the existence of Glasscock's liens thereon and his claim of superiority of liens. Substantiating the information which T. W. Spinks Company admits it its stipulation that it had knowledge of Glasscock's claim of superiority of liens on the lots to secure him in the payment of the purchase-money, it concedes that, before and at the time it furnished the material, it had received from Glasscock a letter in which he stated to it:

"I also understand that you have filed, or are going to file, a mechanic's lien on said property. Mr. Browning further informs me that you are asking for security for any loss you might sustain by reason of said property not bringing a sufficient sum

at a foreclosure sale to pay all lien claimants of record in full. I hereby agree to indemnify you. * * * The indemnification is to be of no effect until you have asserted your mechanic's lien rights, instituted suit to enforce your lien, have notified me in writing at the commencement of said suit, have caused said property to be sold to satisfy said lien, and the amount of loss actually determined. When the loss has been determined in the above manner, I will then pay you the difference between what you received at the sale and the contract price, upon your assignment of your deficiency judgment to me.''

Admittedly, if Glasscock's written contracts with the purchasers of the lots were sufficient to constitute consent within the purview of section 2463, for the purchasers to acquire material on credit with which to erect improvements on the lots, and for the material man's lien to be superior to that of Glasscock's to secure him in the payment of the purchase money, it should be conceded that this letter constituted actual knowledge to T. W. Spinks Company of his withdrawal of such consent, and in lieu thereof agreed to indemnify it as per the terms of this letter, in the event it furnished the material to the purchasers of the lots. T. W. Spinks Company thereafter furnished the material. In the absence of evidence to the contrary, it is conclusively presumed that it did so as per the terms of the letter. Having failed to comply with the conditions set forth therein, it is in no attitude to assert liens superior to Glasscock's. It is argued in its brief that the trial court misconstrued the stipulation of T. W. Spinks Company and Glasscock. If this statement be accepted as true, the fact remains that it furnished the material on the conditions set forth in the letter and it entirely failed to perform those conditions; therefore the trial court did not err in decreeing Glasscock's liens superior to its.

Wherefore the judgment is affirmed.

The whole court sitting.